IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 12, 2014

## WILLIAM CARTER KING v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Fentress County**
**No. 2012-CR-01      E. Shayne Sexton, Judge**

---

**No. M2014-00512-CCA-R3-PC - Filed December 17, 2014**

---

The Petitioner, William Carter King, appeals the Fentress County Criminal Court's denial of his petition for post-conviction relief from his 2011 guilty plea to possession of a controlled substance in a penal institution and his five-year sentence. The Petitioner contends that (1) he received the ineffective assistance of counsel and (2) his guilty plea was unknowingly and involuntarily entered. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Ieshia Dupes (on appeal) and Harold E. Deaton (at post-conviction hearing), Jamestown, Tennessee, for the appellant, William Carter King.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith DeVault, Senior Counsel; William Paul Phillips, District Attorney General; and John W. Galloway, Jr., Deputy District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from the Petitioner's possessing a controlled substance after he returned to the Fentress County Jail from a furlough. On July 9, 2009, the Petitioner pleaded guilty in case number 9536 to burglary and felony theft and received an effective seven-year sentence with one year's confinement and six years' probation. On January 24, 2011, the Petitioner pleaded guilty in case number 10-108 to possession of a controlled substance in a penal institution and received a five-year sentence to be served on community corrections and consecutively to his probation in case number 9536, for an effective twelve-year

sentence. The trial court also ordered the Petitioner to complete a drug rehabilitation program.

On May 16, 2011, the Petitioner's community corrections officer filed a petition for community corrections revocation, alleging that the Petitioner was dismissed from the rehabilitation program for selling pain medication and falsifying a drug screen. After an evidentiary hearing, the trial court revoked the Petitioner's alternative sentences and ordered the Petitioner to serve his effective twelve-year sentence in confinement. The Petitioner appealed the trial court's revocation, and this court affirmed the revocation and summarized the facts of the case as follows:

> At the revocation hearing, Richard Moggett testified for the State that he was the Assistant Director at Faith Farm Ministries in Fort Lauderdale, Florida. He explained that Faith Farm was a sixty-year-old "faith based" drug and alcohol regeneration program and that he was responsible for disciplinary actions and overseeing drug testing. The appellant enrolled in the program in February 2011. Moggett said that during the appellant's stay, the appellant had "some medical issues" and was granted "passes" to go to a hospital in the area. Moggett said that the appellant was "progressing well, but every so often, we would hear his name come to us in association with some other behavior." After the appellant's last visit to the hospital, he exhibited unusual behavior. Moggett asked the appellant if he had received medication at the hospital, and the appellant said he had received a shot of Morphine. Due to the appellant's odd behavior, the appellant was tested for drugs. The appellant tested positive for Morphine and Oxycodone. Although the appellant had not said he received Oxycodone at the hospital, Moggett decided to let the appellant remain at Faith Farm because "we could not find out if he had actually been given Oxycodone at the hospital." Four days later, the appellant was given another drug test. Moggett said that the urine sample the appellant submitted for the test was "off color, dark brown, very hot to the touch. In fact, the temperature was at 102 degrees." The appellant was asked to leave the program, and he did so immediately. Moggett notified the appellant's probation officer that the appellant had been dismissed from Faith Farm.

> On cross-examination, Moggett testified that the appellant's behavior during his stay at Faith Farm was "[p]retty normal behavior for a student in our program." The appellant had written on his application that he had stomach problems, and doctors had prescribed Prilosec. Due to the appellant's condition, he would have been allowed to go to the doctor at least once per month. Moggett said that the appellant was allowed to go more often than

-2-

once per month because his condition "was such a problem for him." The program at Faith Farm was a nine-month program, but the appellant stayed only four months. He went to the hospital at least six times during his stay. Moggett said that when the appellant returned from his last visit to the hospital, the appellant was acting "[k]ind of lethargic, distracted." Moggett said he sensed that something was "out of the ordinary" for the appellant. Moggett said he had been the Assistant Director of Faith Farm for four years, had no education in drug rehabilitation, and was basing his intuition about the appellant from his experience and eleven years of on-the-job training.

Moggett testified that the drug test kits used by Faith Farm were the same ones used by the criminal justice system in that area. After a person gave a urine sample for a test, the collector placed a security tab over the top of the collection bottle, and the testee initialed it. The results of the test were read within five minutes. A temperature strip on the bottle determined the urine's temperature. Moggett said that Faith Farm usually tried to have an employee witness a testee give a urine sample and that "[w]e have on occasion found devices that they attach to the thigh that would give a sample. They would actually run a tube alongside of their genitals and use that." He explained, "Any invalidation of that test, we presume it is . . . on purpose and so, we dismiss." The appellant's second test was negative for drugs, but the color and high temperature of his urine invalidated the test and resulted in his dismissal from the program. The appellant was not given prior notice of the test, and he was not checked for a device attached to his thigh after the test. Moggett acknowledged that he had no explanation for the urine's dark color and high temperature.

Candace Norman testified that she was the appellant's community corrections officer and began supervising him on January 24, 2011. Norman said that she arranged for him to go to Faith Farm and that "I truly believe in their program." Norman had never known Faith Farm to dismiss someone from the program inappropriately. On May 14, 2011, she received a letter informing her that the appellant had been dismissed from the program. The appellant also telephoned Norman and informed her that he had been discharged. Norman filed the Petition for Violation of Community Corrections and told the appellant that he needed to return to Fentress County. The appellant did not return to Fentress County voluntarily.

The trial court determined that the State had established a probation violation by a preponderance of the evidence. Specifically, the trial court stated,

> The protocol in taking this - what was characterized as old urine was established by the witness. The language itself speaks [that] the client falsified. I think [defense counsel] takes exception to that because there is no showing that he actually rendered the test, that he received it from someone else or if he had -- had it put up. The fact of the matter is that the Faith Farms has established that there was a drug test that could not be tested. In particular, when you're -- the witness testified that the urine has a temperature of 102 which is virtually impossible unless the submitting person was running extended fever. I mean, just -- it's just impossible.

> The court noted that the appellant had been in various rehabilitation programs over the years and stated that there was "nothing else to do." The trial court ordered that the appellant serve his alternative sentences in confinement.

*State v. William Carter King*, No. M2011-02561-CCA-R3-CD, 2013 WL 1143246, at *1-3 (Tenn. Crim. App. Mar. 20, 2013) (footnote omitted), *no app. filed*.

On January 4, 2012, the Petitioner filed a pro se petition for post-conviction relief in case number 10-108 alleging multiple grounds, including the ineffective assistance of counsel and an involuntary guilty plea to possession of a controlled substance in a penal institution. After the appointment of counsel, an amended petition was filed on April 12, 2012, also alleging that counsel was ineffective and that the Petitioner entered an unknowing and involuntary guilty plea. On November 13, 2012, appointed counsel was permitted to withdraw after the Petitioner complained of counsel's performance. The Petitioner told the post-conviction court that he had filed complaints with the Tennessee Board of Professional Responsibility. Subsequent counsel was appointed.

At the post-conviction hearing, the Petitioner testified that he was originally charged with introduction of Schedule II and III controlled substances into a penal institution but pleaded guilty to possession of a controlled substance in a penal institution. He said he was sick on the day he entered his guilty plea, and he later learned that his gall bladder was causing his illness. He said he was "physically sick" and did not know what he was signing when he signed the plea agreement form. He said, though, that he knew he was signing

-4-

something that he should not have signed. He said, "I was frustrated, I [knew] I would never do 12 years, but I was pretty desperate."

The Petitioner testified that in July 2009, he pleaded guilty to theft and to burglary and that he had to serve one year in jail for theft, although he received six years for burglary. He said he "flattened" his sentences and was released from confinement. He denied he was released to probation for the remainder of his sentence. He said that after he was released, he was charged with disorderly conduct. He said his "sentence was revoked" after a probation revocation hearing. The Petitioner said he told counsel that he was not on probation but that counsel never raised the issue with the trial court.

The Petitioner testified that he attempted to contact counsel after he pleaded guilty to the drug-related charge in case number 10-108 because he was having trouble getting into a rehabilitation program and that he told counsel to withdraw his guilty plea. Relative to the Petitioner's pleading guilty, the Petitioner said, "I didn't make a smart choice at all, to say the least." He claimed that his illness affected his ability to make good decisions and that had he not been sick, he would have rejected the plea offer. He said he vomited two or three times before the plea hearing and asked counsel for a furlough. Counsel told the Petitioner that the trial court would not grant a request for a furlough, and the Petitioner responded, "Go tell [Deputy District Attorney] John [Galloway] I'll give him three years running wild with this." Counsel told the Petitioner that the prosecutor would agree to five years for possession of a controlled substance in a penal institution. The Petitioner said, "[T]hat was that on that."

The Petitioner testified that although he was initially charged with introduction of a controlled substance into a penal institution, the State sought to amend the charge to possession of a controlled substance before he completed the indigency form. He said counsel told him that he was charged with misdemeanor possession. He agreed he was not represented by an attorney when the charge was amended and said he did not know it was an issue until looking into the matter later. When asked if he talked to counsel about the amendment, he said, "The best I got out of [counsel] was that on the plea date there was a mistake . . . on the probation revocation."

Relative to the Petitioner's request for counsel to file a motion to withdraw the guilty plea, the Petitioner testified that he attempted to use the telephone at the jail to contact counsel, but "Vella" told him that he could not use the telephone because Ms. Norman did not want the Petitioner using the telephone anymore. The Petitioner received a letter from counsel regarding the guilty plea, and he read the relevant paragraph stating,

-5-

Once you pleaded guilty, that ended any ability you had to challenge the sentence based on its length, or on your opinion regarding the State's case against you. The phone conversation you refer to, involving Ms. Norman, took place after your guilty plea; once you plead, you cannot "withdraw" your agreement, at least not unless the State was not abiding by its end of the plea. Now, believe me, if I felt that the State was not taking proper steps to let you start treatment, I would have followed up and, ultimately, I would have taken some sort of action if necessary. But that was not the case, at least in my opinion. You were given the opportunity to seek treatment, and so the State lived up to its side of the agreement.

On cross-examination, the Petitioner testified that he had a lengthy criminal history with convictions for three counts of aggravated burglary in 2001, felony theft in 2000, two counts of forgery in 1998, and four counts of forgery in 1996. He discussed with counsel his potential of being sentenced as a persistent or career offender if he were sentenced after a trial. He recalled the prosecutor filing a motion to have the Petitioner classified as a career offender. He understood that without a plea agreement, he faced a considerably longer sentence if convicted at a trial.

The Petitioner testified relative to case number 9536 that he was released on bond when he entered his burglary and theft guilty pleas and that a sentencing hearing was later held to determine if he would receive probation. He said that the parties agreed to seven years' supervised probation and that he was charged and convicted of two counts of misdemeanor theft before the sentencing hearing. The theft convictions changed the State's position on sentencing relative to the burglary and theft convictions, and the Petitioner said the parties agreed that the Petitioner would serve eleven months, twenty-nine days in jail and that the Petitioner would be placed on probation for seven years. The Petitioner was unclear about the two theft sentences but agreed that the trial court ordered him to spend one year in jail followed by seven years' probation and to attend a long-term rehabilitation program.

The Petitioner testified that while he was serving the one year in confinement, he was given a furlough to obtain identification for the rehabilitation program he was going to attend upon his release from jail. After returning from the furlough, the Petitioner was charged with introduction of controlled substances into a penal institution. The Petitioner admitted he was charged only days before his scheduled release. He said that Ms. Norman was his community corrections officer and that she coordinated his release date and his acceptance into the program.

The Petitioner testified that the case in which he thought he "flattened" his sentence was in general sessions court. He agreed that regardless of whether he was on probation in general sessions court for an unrelated case, he still had a seven-year sentence in criminal court related to the burglary and felony theft. When asked if he had understood that the introduction of a controlled substance into a penal institution charge provided an adequate basis for the State to revoke the seven-year plea offer relative to the burglary and theft, the Petitioner stated, "Mr. Galloway, I'm a career criminal offender pretty much, and you've been more than lenient with me on this, I know that. But, yeah, I [knew] what could happen and what should happen."

The Petitioner testified relative to case number 10-108 that during the plea negotiations, counsel told him that "the State's gonna dismiss this charge and throw it out and . . . you can go ahead and do the violation time." The Petitioner told counsel that he was not on probation and said he understood counsel to be talking about the misdemeanor theft probation. The Petitioner said he only wanted medical treatment while the controlled substance charge was pending. He asked counsel to obtain a medical furlough, and counsel advised that a furlough was no longer possible given the circumstances underlying the controlled substance charge. The Petitioner agreed that he ultimately pleaded guilty to possession of a controlled substance in a penal institution and understood the five-year sentence was consecutive to the seven-year sentence related to the burglary and misdemeanor theft. The Petitioner understood that after serving one year in jail, he would be released to a long-term rehabilitation program and that he would serve the remainder of his sentence on probation. He stated that he went to the rehabilitation program, that he was discharged from the program, that a probation violation warrant was filed, and that the trial court revoked his probation and ordered him to serve the effective twelve-year sentence.

The Petitioner testified that he asked counsel to withdraw his guilty plea about two weeks after the guilty plea hearing but before he entered the rehabilitation program. He said there was insufficient evidence regarding the controlled substance conviction. He said counsel told him that the case did not have any discoverable evidence, although he agreed the officer who found the drugs testified at the preliminary hearing. The Petitioner said he asked counsel if he could be convicted based solely on the officer's testimony, and counsel said he could be convicted given the officer's experience with narcotics. He understood he would still face a probation revocation and a controlled substance charge even if the guilty plea were successfully withdrawn.

Community Corrections Officer Candace Norman testified that she assisted the Petitioner in finding a long-term rehabilitation program in Florida. She recalled that the Petitioner had no identification or birth certificate and that some form of identification was required for acceptance into a rehabilitation program. The Petitioner was granted a furlough, but he failed to comply with the requirement that he was to be in the attendance of his

brother, Mark King, at all times. The Petitioner was charged with the controlled substance offense when he returned to the jail from his furlough.

Ms. Norman testified that during the furlough, she worked on finding a rehabilitation program in Florida, but the Petitioner did not think she was working fast enough. The Petitioner contacted counsel because he thought counsel could work faster. Ms. Norman and counsel spoke twice and discussed who was going to work with the program administrators. They decided Ms. Norman would work with the program because Ms. Norman had worked with the program administrators previously and counsel had not. Ms. Norman agreed to keep counsel informed of her progress. She said that the problem with the Petitioner was his complaining about the speed in which she was working on his acceptance into the desired program and that he "twist[ed] things" when he talked to counsel. She said the incident during which she took the telephone from the Petitioner and spoke to counsel was one of the conversations they had about who was going to work with the program. She denied she took the telephone from the Petitioner when he and counsel were discussing the plea offer.

Ms. Norman testified that although the Petitioner did not obtain identification during his furlough, she obtained an expired driver's license from the Petitioner and sent it to the rehabilitation program administrators. The Petitioner participated in an intake interview for the program over the telephone, and Ms. Norman said the program accepted the Petitioner. She said the Petitioner was ultimately discharged from the program. She had no knowledge of the Petitioner's desire to withdraw his guilty plea.

On cross-examination, Ms. Norman testified that the Petitioner was accepted into the rehabilitation program about one month after he entered his guilty plea. She said that acceptance into a program usually took about three weeks but that the Petitioner's lack of valid identification delayed the process.

On redirect examination, Ms. Norman testified that if the Petitioner told the person conducting the intake interview that he had a bad gall bladder, the rehabilitation program would have told her that the medical problem had to be resolved before the Petitioner could be admitted into the program. She was not present during Mr. Moggett's testimony at the probation revocation hearing and had no knowledge he testified that the Petitioner reported "stomach problems" on the program application.

Counsel testified that he had practiced law for two and one-half years and that he was appointed to represent the Petitioner in 2010 in general sessions court. He said that the Petitioner stated numerous times that he did not believe he was on probation because he had flattened his sentence and that the probation violation was a mistake. Counsel researched the issue. He explained to the Petitioner that the probation violation report was filed before the

-8-

general sessions sentence expired. Counsel also learned that the Petitioner was on probation in criminal court and explained to the Petitioner that he might face a probation revocation in criminal court.

Counsel testified relative to amending the drug-related charge to possession of a controlled substance that the probation violation warrant stated that the charge was possession, not introduction, and that counsel advised the Petitioner that possession was a misdemeanor charge. After he reviewed the arrest warrants from general sessions court, he learned the charge was possession of Schedule II and III controlled substances in a penal institution and explained the implications of that charge accordingly. The Petitioner told counsel that the pills were not his and claimed that the tight living arrangements in the jail made it relatively easy for another inmate to place the pills in a sock on the Petitioner's mat. Counsel spoke to another inmate who confirmed the Petitioner's theory. Counsel planned to present the inmate at the preliminary hearing, but the inmate's testimony changed completely when counsel prepared him for court.

Counsel testified that he explained the risk of going to trial given the Petitioner's extensive criminal history. Counsel requested the State's discovery package but had not received it at the time of the guilty plea. Counsel explained to the Petitioner that if he wanted to accept the plea offer, his acceptance would be without the benefit of the State's discovery package. Counsel explained to the Petitioner, though, that they had the benefit of the preliminary hearing testimony and that despite any weaknesses in the State's case, the Petitioner faced a potentially lengthy sentence and consecutive service.

Counsel testified that he did not have the laboratory analysis report regarding the contents of the pills but said the officer who testified at the preliminary hearing identified them by their appearance. He agreed that the Petitioner never claimed the pills were "fake" or were not controlled substances. The Petitioner told counsel that his primary objective was to negotiate a plea agreement that would permit him to attend a rehabilitation program. Counsel and the prosecutor discussed a program at length. Counsel recalled the State was not initially receptive to the proposal and wanted the Petitioner simply to serve his sentence.

Counsel testified that he explained to the Petitioner that the drug-related charge was not the only concern because the Petitioner faced a probation revocation of his seven-year sentence in case number 9536. Counsel discussed the risks associated with accepting twelve years' probation, and he noted the State's agreeing to a rehabilitation program was very important to the Petitioner. He noted the Petitioner immediately pleaded guilty when the parties agreed to twelve years, which permitted him to attend a program.

Counsel testified that he recalled the Petitioner's complaining of bad headaches related to black mold in the jail and that the Petitioner made these complaints when he visited the Petitioner at the jail relative to preparing the Petitioner for the preliminary hearing and for a criminal court appearance. Counsel mentioned the Petitioner's concerns about the mold to the sheriff and to correction officers. He did not recall any other health-related complaints.

Counsel testified that the Petitioner complained about the speed in which Ms. Norman worked to get him admitted into a rehabilitation program. Counsel and Ms. Norman discussed her progress, and Counsel decided to permit Ms. Norman to continue her work based on her experience with rehabilitation programs. Counsel relied on Ms. Norman because probation officers had "better access to dealing with that." The Petitioner complained to counsel that he wanted to be released on a specific date and to a specific program. Counsel explained to the Petitioner before he entered his guilty plea that those terms were not part of the plea agreement. Counsel also explained after the plea hearing that no guaranteed date of release existed and that no agreement existed for a particular program. The Petitioner thought the plea agreement had been violated because he was not going to be released on a certain date or to a specific program, and counsel said he explained to the Petitioner that those were not grounds upon which a guilty plea could be withdrawn.

On cross-examination, counsel testified that he had only practiced law about one or two months at the time he was appointed to the Petitioner's case and that he had handled about ten to twelve felony cases before his appointment in this case. He did not recall the Petitioner's being ill on the day he pleaded guilty but recalled the Petitioner said he was "frustrated." Counsel recalled that the Petitioner was given the option to flatten the seven-year sentence and that the Petitioner rejected that plea offer because he wanted to attend a rehabilitation program.

Counsel testified that the Petitioner asked for a medical furlough to be included in the plea agreement but that the State would not agree to it. Counsel explained to the Petitioner that a medical furlough would not be included in any plea agreement because the drug-related charge came about after the Petitioner brought drugs into the jail after being granted a furlough.

Upon questioning by the post-conviction court, counsel testified that he began practicing law in 2010. He said that he would not have done anything differently during his representation of the Petitioner. He said the Petitioner likely faced serving seven years on his original conviction after a revocation hearing and also serving a lengthy sentence on the drug-related charge because of his criminal history. Counsel noted the likelihood of

-10-

consecutive service because the drug-related offense was committed while the Petitioner was on a furlough.

On recross-examination, counsel testified that although the pills found inside the jail had not been analyzed, he told the Petitioner that the identity of the pills would have been proven at a trial. Counsel likewise told the Petitioner that if he pleaded guilty, he was doing so without the benefit of a laboratory report. Counsel stated that the Petitioner was willing to waive the right to receive a laboratory report in order to obtain the sentence he received and to attend a rehabilitation program. On further redirect examination, counsel agreed that he had no evidence showing the pills were lost and could not be analyzed.

The Petitioner was recalled in rebuttal and testified that Mr. Moggett from the rehabilitation program had testified at the probation revocation hearing that the Petitioner informed the staff of his stomach problems and that the staff allowed the Petitioner to obtain outside medical treatment. The Petitioner claimed he did not know his stomach problems were the result of his gall bladder. Relative to the plea negotiations, he recalled that at one point, the State offered to dismiss the drug-related offense and proceed with a revocation hearing on the seven-year sentence. He asked counsel if he could get a medical furlough because he was sick, and counsel told him a furlough would not be possible. The Petitioner said he "figured as much." He said he was sick on the day he pleaded guilty and was "real frustrated." He said, "In hindsight, I would have never pled, never. I mean, it is what it is."

Upon discussion with the parties, the post-conviction court permitted the Petitioner to late file his medical records. Counsel told the court that the Petitioner believed the records would show the Petitioner was suffering from gall bladder problems on January 24, 2011, when he pleaded guilty. The court stated it would "take that for the truth" but found that the medical records were not suggestive of any involuntariness.

The post-conviction court reviewed the guilty plea hearing transcript and found that the Petitioner answered questions appropriately and that his dialogue with the trial court was appropriate. The post-conviction court found no evidence in the transcript suggesting "a problem" with the guilty plea.

The post-conviction court noted the discrepancy between the Petitioner's testimony and that of counsel and Ms. Norman. The court credited counsel and Ms. Norman and noted that the Petitioner would have been unsatisfied with "any situation that we could have designed." The court found that the prosecutor offered to dismiss the drug-related charge if the Petitioner agreed to serve the seven-year sentence but that the Petitioner rejected that offer. The court noted the Petitioner made a tactical decision, which carried risk. The court found that no evidence showed that counsel was overbearing in his advice to the Petitioner

-11-

and that the Petitioner entered a voluntary and intelligent wavier of all his rights at the guilty plea hearing. The court found that the Petitioner failed to show that he did not understand what was happening at the guilty plea hearing and stated that it was not sure if any responsible lawyer would have pleased the Petitioner. The court found that counsel provided effective assistance.

The post-conviction court filed a written order denying post-conviction relief. In the order, the court found that the Petitioner's guilty plea was freely, voluntarily, and intelligently made and that counsel provided effective assistance. The court found that counsel's advice concerning the appropriateness of the guilty plea was proper and that counsel was adequately prepared. The court found that counsel performed the necessary investigation to advise the Petitioner properly and that the Petitioner knowingly waived any further preparations in order to plead guilty. This appeal followed.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

# I
## Ineffective Assistance of Counsel

The Petitioner contends that he received ineffective assistance because counsel failed to inform him of the proper classification of the charge, failed to ask for a medical furlough, failed to obtain all discoverable evidence, and failed to withdraw his guilty plea. The State responds that counsel provided effective assistance. We agree with the State.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

-12-

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Regarding counsel's failure to inform the Petitioner of the proper classification of the drug-related charge, the record reflects that counsel initially told the Petitioner that he was charged with a Class A misdemeanor. Counsel, however, learned the Petitioner was charged with a Class C felony after he received the arrest warrants from general sessions court. Counsel told the Petitioner about the correct offense classification before the guilty plea hearing. We note the Petitioner told the trial court at the guilty plea hearing that he understood he was pleading guilty to a Class C felony that carried a possible sentence of three to fifteen years. The Petitioner is not entitled to relief on this basis.

Relative to counsel's failure to request a medical furlough, the record reflects that counsel only recalled the Petitioner's complaining about headaches associated with black mold at the jail. Likewise, counsel said the Petitioner's complaining occurred during counsel's visits at the jail, not at the courthouse, and counsel mentioned the Petitioner's complaints to the sheriff and to correction officers. Although the Petitioner claims that he would have been granted a furlough for medical treatment had counsel requested it, counsel testified that he requested a medical furlough during plea negotiations but that the State refused. The Petitioner's possession of a controlled substance in a penal institution charge occurred as a result of the Petitioner's return from a furlough. We note Ms. Norman's testimony that the Petitioner failed to obtain the identification required for his long-term rehabilitation program and to remain in the attendance of his brother during that furlough.

-13-

Counsel properly advised the Petitioner that the State and the trial court would not agree to another furlough given his conduct during the previous furlough. The Petitioner is not entitled to relief on this basis.

Relative to the State's discovery package, the record reflects that at the time of the guilty plea hearing, the pills found in the Petitioner's possession had not been analyzed. The officer who found the pills testified at the preliminary hearing regarding his experience with controlled substances and identified the pills based on their appearance. During the plea negotiations, counsel advised the Petitioner that he had not received the State's discovery package and that accepting the State's plea offer at that time would be without the benefit of the laboratory analysis. Counsel explained that in the absence of an analysis report, the officer who testified at the preliminary hearing could provide consistent testimony at a trial. Counsel also explained to the Petitioner that regardless of any weaknesses in the evidence, he faced a potentially lengthy sentence as a possible career offender and consecutive service. We note the Petitioner never claimed the pills were not a controlled substance. Counsel explained to the Petitioner the risks associated with twelve years' probation, but the Petitioner's primary objective was to obtain an agreement that would permit him to attend a long-term rehabilitation program. Counsel testified that the Petitioner was willing to waive the right to receive a laboratory report in order to obtain the sentence he received and to attend a rehabilitation program. The record reflects that the Petitioner accepted the plea offer after being informed of the status of the State's discovery package. We note that at the guilty plea hearing, the Petitioner told the trial court that he was satisfied with counsel's work and investigation in this case and that he had no complaints to report about counsel. The Petitioner is not entitled to relief on this basis.

Relative to counsel's failure to withdraw the Petitioner's guilty plea, the record reflects that the Petitioner complained to counsel about the slow rate in which Ms. Norman worked to get him admitted into a long-term rehabilitation program. Counsel and Ms. Norman spoke about who was going to coordinate the program, and they agreed Ms. Norman would continue her work because she was familiar with the process and had more access to the appropriate administrators. Although the Petitioner told counsel that the plea agreement had been violated because he was not going to be released on a specific date or to a specific program, counsel advised the Petitioner that those were not grounds upon which a guilty plea could be withdrawn. The Petitioner failed to present evidence at the post-conviction hearing that a basis existed to withdraw his guilty plea. The Petitioner is not entitled to relief.

-14-

## II
## Involuntary Guilty Plea

The Petitioner contends that his guilty plea was not freely, voluntarily, and intelligently entered. He argues that his sickness on the day of the guilty plea hearing affected his ability to "make a smart choice" and that he would not have pleaded guilty had he not been ill. The State responds that the Petitioner failed to show by clear and convincing evidence that his guilty plea was unknowing and involuntary. We agree with the State.

The Supreme Court has concluded that a guilty plea must represent a "voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). A trial court must examine in detail "the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin v. Alabama*, 395 U.S. 238, 243-44 (1969); *see Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). Appellate courts examine the totality of circumstances when determining whether a guilty plea was voluntarily and knowingly entered. *State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995). A guilty plea is not voluntary if it is the result of "[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats." *Boykin*, 395 U.S. at 242-43; *see Blankenship*, 858 S.W.2d at 904. A petitioner's representations and statements under oath that his guilty plea is knowing and voluntary create "a formidable barrier in any subsequent collateral proceedings [because] [s]olemn declarations . . . carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

The record reflects that at the guilty plea hearing, the trial court advised the Petitioner that he was under oath and subject to the penalties of perjury if he answered the court's questions falsely. The court told the Petitioner that he should notify the court if he did not understand any of the questions, and the Petitioner indicated he understood. The court told the Petitioner that possession of a controlled substance in a penal institution was a Class C felony and carried a possible sentence of three to fifteen years, and the Petitioner said he understood the felony classification and the possible sentence. The Petitioner said he understood he had the rights to plead not guilty, to have a trial, to testify or not to testify, to subpoena witnesses, and to an appeal. The Petitioner said he understood that by pleading guilty, he was giving up those rights.

The Petitioner told the trial court that he understood his conviction could be used to enhance any future sentence and could be used to impeach any future sworn testimony. The Petitioner understood that he was going to lose the right to vote and to run for public office as a result of being convicted of a felony. The Petitioner said he was thirty-eight years old, had completed the eleventh grade, and was literate.

The Petitioner told the trial court that by signing the plea agreement form, he was indicating that he read and understood the form. The Petitioner denied being under the influence of alcohol, drugs, or medication that might cause him not to understand what was happening. The Petitioner denied anyone threatened or forced him to plead guilty or made promises in exchange for his guilty plea. The Petitioner claimed he was pleading guilty freely.

The Petitioner told the trial court that he was satisfied with counsel's work and investigation of the facts and law relevant to his case and thought counsel would have been ready for a trial. The Petitioner had no complaints about counsel's performance. Counsel told the court that he was satisfied with the court's procedures at the guilty plea hearing and with counsel's investigation of the facts and law to the point that he was satisfied with the recommendations he made to the Petitioner. The Petitioner told the court that he was guilty of possession of a controlled substance in a penal institution and agreed he was pleading guilty because he was guilty.

The parties stipulated that on August 20, 2010, the Petitioner knowingly possessed a Schedule II controlled substance in the Fentress County Jail, a penal institution where prisoners were quartered, and that the Petitioner possessed the substance without any express authorization from the sheriff or jail administrator. The Petitioner agreed with the facts as recited by the State, and counsel said the facts were consistent with his investigation. The trial court accepted the guilty plea.

We conclude that the record does not preponderate against the post-conviction court's finding that the Petitioner knowingly, voluntarily, and intelligently entered his guilty plea. The record shows that at the guilty plea hearing, the trial court reviewed the appropriate matters with the Petitioner pursuant to Tennessee Criminal Procedure Rule 11 and that the Petitioner understood his rights, the offense to which he was pleading guilty, and the agreed-upon sentence. The transcript of the guilty plea hearing fails to show any mention of the Petitioner's being ill on the day he entered his guilty plea. Likewise, counsel testified that the Petitioner only complained of headaches from black mold and that those complaints were made when counsel visited the Petitioner at the jail. The record shows that the Petitioner had an extensive criminal history and was familiar with court proceedings. The Petitioner wanted a plea agreement that would permit him to attend a long-term rehabilitation program. In that regard, counsel obtained what the Petitioner wanted. The Petitioner's guilty plea was not the result of ignorance, incomprehension, coercion, terror, inducements, or threats and as a result, was not involuntary. *See Boykin*, 395 U.S. at 242-43; *see also Blankenship*, 858 S.W.2d at 904.

We note that the Petitioner actively participated in the plea negotiations on the day he entered his guilty plea. After counsel advised the Petitioner that the State would not agree

to a furlough, the Petitioner told counsel to tell Deputy District Attorney John Galloway, "I'll give him three years running wild with this." Counsel told the Petitioner that Mr. Galloway would agree to five years for possession of a controlled substance in a penal institution. The Petitioner said, "[T]hat was that on that." The Petitioner failed to present evidence that his guilty plea was unknowing and involuntary. The Petitioner is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.


_____
ROBERT H. MONTGOMERY, JR., JUDGE